UNITED STATES v. TEXAS & P. R. CO.

(Circuit Court, E. D. Louisiana, New Orleans Division. January 31, 1911.)

1. CARRIERS (§ 26*) — INTERSTATE COMMERCE ACT — VIOLATION — DEFENSES — WILLFULNESS.

A violation of Interstate Commerce Act (Feb. 4, 1887, c. 104, § 10, 24 Stat. 382 [U. S. Comp. St. 1901, p. 3160]), providing that, if a carrier willfully violates any provisions of the act, it shall be liable for penalty, is not made out by proof of an overcharge due to accident or mistake, but is only established by evidence of a willful act or omission.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 26.*]

**2. CARRIERS (§ 30\*)—REGULATION—INTERSTATE COMMERCE ACT—OFFENSES.**

Under the provisions of the interstate commerce act (Act Feb. 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3154]) that no carrier shall charge, demand, collect, or receive a greater or less compensation for service than the rates, fares, and charges specified in the tariff filed and in effect at the time, a willful demand of more than the tariff rates by a carrier is of equal criminality with an actual collection thereof.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 30.\*]

**3. CARRIERS (§ 100\*) — TRANSPORTATION SERVICE — TERMINATION — NOTICE — RULES.**

Under a carrier's rule that it shall give prompt notice by mail or otherwise of the arrival of freight, such notice cannot be given so as to authorize the carrier to charge for storage until the cars containing the freight have been placed in such a position that they may be unloaded and thus change the carrier's relation to that of warehousemen.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 100.\*]

**4. CARRIERS (§ 30\*)—REGULATION—INTERSTATE COMMERCE ACT—OFFENSES—STORAGE CHARGES.**

Where a carrier gave notice of the arrival of freight before it had so placed the cars that the freight could be delivered to the consignees, and thereafter attempted to charge storage while the cars remained in its possession as the carrier, in addition to the freight rates it was authorized to charge under its published tariffs, there was a willful violation of the provisions of the interstate commerce act, providing that no carrier shall charge, demand, or collect different compensation for service than the rates specified in the tariff filed.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 30.\*]

Indictment against the Texas & Pacific Railroad Company for violation of the interstate commerce law. On defendant's motion to direct a verdict. Denied.

Charlton R. Beattie, U. S. Atty.

Chandler C. Luzenberg, for defendant.

GRUBB, District Judge (charging jury). The defendant, the Texas & Pacific Railroad Company, is indicted in this case for a violation of the interstate commerce law. It is admitted that it is a common carrier to which the interstate commerce law applies by reason of the fact that it does an interstate commerce business; that is, a commerce between the different states of the Union.

The section under which it is prosecuted is section 10 of the act to regulate commerce (Act Feb. 4, 1887, c. 104, 24 Stat. 382 [U. S. Comp. St. 1901, p. 3160]), which provides that if the carrier willfully violates any provision of the act it is liable to a penalty. It is not necessary for me to read section 10 in full; but the material part of it is that the omission or act complained of must be a willful act or omission. In other words, an accidental mistake is not the basis of a prosecution under the interstate commerce law, but it must be a willful violation of the act. The violation of the act relied on in this case is found in this provision:

"No carrier, unless otherwise provided by this act, shall engage or participate in the transportation of passengers or property, as defined in this act, unless the rates, fares, and charges upon which the same are transported by said carriers have been filed and published in accordance with the provisions

---

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

of this act." (That means with the interstate commerce act. The evidence that has been introduced in this case shows that the tariff was filed with the Interstate Commerce Commission.) "Nor shall any carrier charge, or demand, or collect, or receive a greater, or less, or different compensation for such transportation of passengers or property, or for any service in connection therewith, between the points named in such tariffs than the rates, fares and charges which are specified in the tariff filed and in effect at the time."

That is the only part of it that is material to this prosecution. The claim of the government is that the Texas & Pacific Railway Company demanded or received, in three counts that they demanded and received; and in one count that they demanded but did not receive (I think in the Stanton count Mr. Stanton testified he had not paid it). But the act makes the willful demand of equal criminal character, as far as your functions are concerned, as the actual collection of it.

So the thing for you to determine is: First, whether the storage was demanded or received; and, second, whether the demand and receipt of it was a willful violation of this act. As I say there is no dispute in the case that, under all the counts except the Stanton count, storage was received, as evidenced by these bills and as charged in the indictment, and in the Stanton count the evidence, I believe, without dispute, shows it was demanded but not received.

Then the question for you to determine is whether that demand or demand and receipt of the storage was legal or illegal under this act to regulate commerce.

The Texas & Pacific Railway Company had filed a schedule or tariff of rates from the different points where these shipments originated. I think one was Ulm, Ark., and one Stuttgart, Ark., and one Kansas City, Mo. There is no dispute about the transportation rates. In two cases it was 17 cents and in the other 23 cents. No overcharge is claimed on the transportation rates. The claim of overcharge arises on the question of storage, after the shipment had arrived at or in the vicinity of New Orleans. The storage is based on the rules that were filed by the Texas & Pacific Railway Company, as provided by law, along with its tariff, with the Interstate Commerce Commission. Those rules have been introduced in evidence. One of them is that the railroad company shall give prompt notice by mail or otherwise of the arrival of freight. These rules apply not only to the Texas & Pacific Railroad, but to a number of different railroads. No storage charge can be made unless notice of legal arrival of shipment has been given to the consignee. This is the rule that is before us for interpretation, because, as I say, it was filed with the Interstate Commerce Commission along with the tariff of the Texas & Pacific Railway Company which governed these shipments, and therefore became a part of its right to such storage, if it had any.

Now, the question that governs the legality of this storage charge is: What is to be considered, under these rules, the arrival of freight? If the arrival of freight merely means that the cars arrive at the terminal of the Texas & Pacific Railroad at New Orleans, then it seems to me clear they had the right to charge storage at Westwego because the evidence shows that the New Orleans terminal includes

Westwego. That is not my view of what constitutes arrival, however. Even if these cars had arrived across the river and been left in the yard at New Orleans, on a storage track for railroad purposes only, but to which the consignee had no access and from which he could not have gotten his freight, in my judgment that would have been no more a delivery for the purpose of instituting a storage charge than if the cars were in Westwego. A carrier has a duty to fulfill under the law, when it accepts a shipment of freight, and that is to transport it from the point of origin and carry it to destination and put it in the customary place of delivery for the consignee at the point of destination. And until it complies with that duty its liability as a common carrier remains. It is its duty to keep the freight, until that time, without cost to the consignee. It only has the right to charge storage when its duty as a carrier ceases and it becomes a warehouseman, and that means (where it is his duty to unload it) when it unloads the freight into a freight warehouse and it remains there after the railroad has given the consignee reasonable time to remove it. After that its liability as a common carrier ceases, and it becomes that of an ordinary warehouseman, and at the same time it has the right to begin charging storage.

Now, the undisputed evidence in this case shows that all these cars remained at Westwego until some time about February 10th, I think, or along about February 8th, probably. Their arrival in Westwego was in the early part of January, and they remained in the Westwego yard across the river at least, with the exception of one car, which I believe the evidence tends to show was probably here on January 18th; that is, Mr. Stanton's car. The other cars were first brought over the river to the city of New Orleans some time early in February. Notice, however, was given of their arrival on January 2d and 3d, and of one car in December. Upon their arrival in the Westwego yard, notice was promptly given by the railroad company to the various consignees. Now, if the evidence had tended to show you it was customary for the consignees, after receiving that notice, to give a disposition of the car to the railroad before any further movement of the car, a different principle would probably prevail. In that case the railroad would have the right to hold the car, whereever it was convenient for it, because the consignee did not expect to unload the car or receive the freight until he gave further notice of disposition to the railroad. But the evidence, on the contrary, in this case, is that the usual method of delivery was to deliver at the Harris Shed, or on the Harris side track, or in what is called the open field or flat field, all in the city of New Orleans, unless different disposition was given before such delivery by the consignee to the railroad. In view of this, I am clear in my mind that the locality at which storage began or the time at which storage began is to be dated from the time the hay was placed at the usual place of delivery for the consignee, and that was either in the Harris Shed, or if it was congested, if there was no room to place it there, then on the Harris side track or on the place called the flat field; one of those three places. In that situation, when the consignee paid his freight to the

cashier of the New Orleans local office, he gave him a delivery order for it, and it thereupon was ready for delivery to him. The railroad had no right to charge storage until the freight was in that attitude, in spite of the fact they had given notice of arrival to the consignee a month before when the cars were over in the Westwego yard.

The railroad company could not give legal notice of arrival in pursuance of the rule until the cars or their contents had been placed ready for delivery to consignee. A rule of the carrier that attempted to provide otherwise would be unreasonable. The rule in controversy, properly construed, does not so provide. Its proper effect is to provide that all customary delivery points for cars or their contents, within a radius of 12 miles from the Customs House in New Orleans, should be subject to the same storage rules as are prescribed for New Orleans proper. The per diem storage charge for New Orleans and that for other points in Louisiana and Mississippi governed by the rules was different. One purpose of the 12-mile provision was to extend such specific rules as applied to New Orleans only by the letter of the rule to delivery points within that, the twelve-mile, radius; and not to require the payment of storage, before ability to deliver to consignee. This is the fair meaning of the language of the rule, and would be preferred to an interpretation which would render the rule illegal for unreasonableness.

Therefore, if you find from the evidence that storage was charged on these cars beginning with their arrival in the Westwego yard, and that the hay in the cars was not ready for delivery to the consignee until some time thereafter, that charge of storage was illegal under the interstate commerce law and under the tariffs filed with the interstate commerce commission, and if you find that state of facts, and find that the railroad willfully demanded that storage, then the railroad would be guilty of a violation of the interstate law, and, if you find those facts beyond a reasonable doubt, they would be guilty under the several counts of the indictment or under such of them as you find storage was so charged or collected. If you have any reasonable doubt of those facts, and a "reasonable doubt" means a doubt founded on the evidence or lack of evidence, namely, that the cars were in the Westwego yard during the period that the storage was charged, then, entertaining that reasonable doubt, it would be your duty to acquit the defendant, and you would also have to find beyond a reasonable doubt in order to convict the defendant that these charges were willful, though that does not mean that they were charged with any malice or bad purpose. If they were demanded knowingly by the officer or the agent of the Texas & Pacific Railway, and if the agent knew that the cars were at Westwego, he is charged with knowledge of the legal meaning of the arrival of the cars. If, therefore, he knew as a matter of fact that the hay was not here, but in Westwego, and with such knowledge insisted on his right to charge these bills, and presented them to the consignees for that purpose, then he would make the railroad company liable for willfully demanding or collecting such charges.

For these reasons, the defendant's request for a directed verdict in its favor is refused, and you are instructed to return a verdict for the government, conditioned upon your finding from the evidence, beyond reasonable doubt, the few facts left open for your determination by the admissions of the parties.